William PRYOR, Plaintiff,

v.

FIREMAN'S FUND INSURANCE COMPANY, Defendant.

William PRYOR, Plaintiff,

v.

PENNSYLVANIA ASSIGNED CLAIMS PLAN, Defendant.

Civ. A. Nos. 80–468, 81–162.

United States District Court, W. D. Pennsylvania.

April 26, 1982.

Jan C. Swensen, Scott, Swensen & Scott, Pittsburgh, Pa., for plaintiff.

James F. Malone, III, Dickie, McCamey & Chilcote, Joseph M. Loughren, Wayman, Irvin & McAuley, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, District Judge.

These two cases arise out of the same set of facts and are before us on motions for judgment on the pleadings by the defendants. The facts are not in dispute. At issue is the effect of the choice of laws provision of the No-Fault Motor Vehicle Act of 1974, 40 Pa.Stat.Ann. §§ 1009.101–1009.701 (Purdon, 1980 Supp.), that is section 110(c) of the act, a section not yet addressed by the Pennsylvania Supreme Court. Jurisdiction is based on diversity of citizenship and our task is to "apply" Pennsylvania law. 28 U.S.C. § 1652 (1979).

On January 30, 1979, the plaintiff, William Pryor, sustained injuries in an automobile accident while riding as a passenger in a pick-up truck owned and operated by Stephen E. Emerson, a New Jersey domiciliary. Mr. Emerson carried no insurance of any kind covering his vehicle. The accident occurred in New Wilmington, Pennsylvania. The other vehicle was owned and operated by Barbara McQuiston. Ms. McQuiston had an automobile liability insurance policy written by the Nationwide Insurance Company which included a no-fault endorsement. The plaintiff was a Connecticut domiciliary and resided at his parents' house in that state. His father's insurance policy, written by the defendant in Civil Action No. 80–468, Fireman's Fund Insurance Company, provided him with some coverage. The limits of that coverage are at issue here.

Following the accident, Pryor filed three actions in this district court. First he filed suit against his father's insurance carrier, *Pryor v. Fireman's Fund Insurance Co.*, Civil Action No. 80–468, claiming that he was entitled to benefits under the Pennsylvania No-Fault Act rather than those provided by Connecticut law. Later Pryor filed a tort action against the drivers of the two vehicles involved in the accident, *Pryor v. McQuiston and Emerson*, Civil Action No. 81–49. Finally he filed suit against McQuiston's insurer and the Pennsylvania Assigned Claims Plan (Pa.A.C.P.) *Pryor v. Nationwide Insurance Company* and *Pennsyl-*

*vania Assigned Claims Plan,* Civil Action No. 81–162, claiming essentially that if Fireman's Fund did not owe Pryor the full Pennsylvania no-fault benefits, then either Nationwide or Pa.A.C.P. did. The Pa.A.C.P. was created to provide a source of last resort for basic loss benefits under the No-Fault Act. *See* 40 Pa.Stat.Ann. §§ 1009.-108, 1009.204. On April 27, 1981 Judge Barron P. McCune of this court dismissed Nationwide from Civil Action No. 81–162 and consolidated the three cases before us.

Pryor's claims against both Fireman's Fund and the Pa.A.C.P. are premised on the theory that *someone* owes him the no-fault benefits provided in the Pennsylvania Act. *See* 40 Pa.Stat.Ann. § 1009.202. This premise does not find support in the Act.

The Pennsylvania No-Fault Act contains two choices of law provisions, one for determining the basic loss benefits available to the victim and another for determining the right of the victim to sue in tort. 40 Pa. Stat.Ann. § 1009.110(c) (hereafter § 110(c)).

The first of these provisions governs our decision in the two cases here at issue and provides that:

> The basic loss benefits available to any victim or to any survivor of a deceased victim shall be determined pursuant to the provisions of the state no-fault plan for motor vehicle insurance in effect in the state of domicile of the victim on the date when the motor vehicle accident resulting in injury occurs. If there is no such state no-fault plan in effect or if the victim is not domiciled in any state, then basic loss benefits available to any victim shall be determined pursuant to the provisions of the state no-fault plan for motor vehicle insurance, if any, in effect in the state in which the accident resulting in injury occurs.

40 Pa.Stat.Ann. § 1009.110(c)(1).

■ This rule seems to be quite clear; if the victim's home state has a no-fault plan, his basic loss benefits are determined by that plan; if the victim's home state lacks a no-fault plan, then he must look to the law of the state in which the accident occurred. Because the plaintiff had a Connecticut domicile at the time of the accident, we must first look to the law of that state and see if it contains a no-fault plan.

■ The legislature has commanded that, "[w]hen the words of a law are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 46 Pa.Stat.Ann. § 551. The plaintiff argues that the choice of law provision of the no-fault act contains an ambiguity in that the phrase "no-fault plan" is not defined within the statute. The Pennsylvania Legislature has indeed chosen not to define the phrase "no-fault plan." The legislature has, however, defined both the term "no-fault benefits" and "no-fault insurance." [1] It strains credulity for us to believe that the legislature intended "no-fault plan" to mean anything more than a state statute creating a system of "no-fault insurance" to provide "no-fault benefits." We perceive no ambiguity.

Two separate panels of the Pennsylvania Superior Court have similarly concluded that § 110(c) is unambiguous. *See Toter v. Knight,* 278 Pa.Super. 547, 420 A.2d 676 (1980); *DuBose v. McCoy,* 277 Pa.Super. 149, 419 A.2d 705 (1980). Both cases involved plaintiffs domiciled in New Jersey who were injured in Pennsylvania. In both *Toter* and *DuBose,* the Superior Court unhesitatingly applied New Jersey law. While it is true that both *Toter* and *DuBose* were tort claims requiring a construction of § 110(c)(2), rather than the basic loss benefits rule under § 110(c)(1), both Superior Court panels treated the two provisions as so intertwined as to require a unitary construction. *See Toter v. Knight,* 420 A.2d at 679, *DuBose v. McCoy,* 219 A.2d at 706.

The question then becomes whether or not the Connecticut statutory provision entitled "No-Fault Motor Vehicle Insurance,"

---

1. 40 Pa.Stat.Ann. § 1009.103 provides, in part: "No-fault benefits" means basic loss benefits, added loss benefits, or both.

"No-fault insurance" means basic loss insurance, added loss insurance, or both.

Conn.Gen.Stat. § 38–319 *et seq.* (1977), constitutes a no-fault plan within the meaning of the Pennsylvania Act's choice of laws provision, § 110(c).

■ We believe that Connecticut's No-Fault Act, Conn.Gen.Stat. § 38–319 *et seq.*, is indeed a "no-fault act" within the meaning of § 110(c)(1). The Connecticut Act is broadly similar to the Pennsylvania law and provides for "basic reparations", *see* Conn. Gen.Stat. §§ 38–319(a)(b), 320, 321, analogous to "basic loss benefits" in Pennsylvania, *see* 40 Pa.Stat.Ann. §§ 1009.103, 1009.-202. In fact, although we believe that the phrase "no-fault plan" needs no further definition beyond the language provided in the statute, the Pennsylvania Insurance Department has given us such a definition:

A "state no-fault plan" is defined to be a plan which contains the following elements:

(i) compulsory or mandatory automobile insurance,

(ii) first party benefits, and

(iii) a restriction on the right to bring action for noneconomic detriment, or a

relevant change in the evidentiary rules of practice and proof with respect to these actions.

31 Pa.Code § 66.41(b)(2) (1980). The Connecticut Act meets all of these requirements. *See* Conn.Gen.Stat. §§ 38–327 ("Mandatory security requirements"), 38–320 ("The owner's insurer is liable to pay, without regard to fault, basic reparations benefits . . ."), 38–323(a) ("No cause of action to recover economic loss or noneconomic detriment based on negligence . . . unless . . . [the statute lists seven factors indicative of a serious accident] . . . .").

The plaintiff claims that two specific elements in the Connecticut no-fault plan render the plan fatally defective for the purposes of § 110(c). First he argues that because Connecticut has placed a $5,000 per person limit on first party benefits [2], these benefits are so obviously inadequate that they cannot be said to constitute first party benefits within the meaning of the Pennsylvania Insurance Department's definition. We disagree. The Pennsylvania Legislature has itself seen fit to provide limits on several elements "basic loss benefits".[3]

2. Conn.Gen.Stat. § 38–320 provides:
   Liability of owner's insurer for basic reparations benefits. (a) The owner's insurer is liable to pay, without regard to fault, basic reparations benefits under a uniform separately identifiable coverage of five thousand dollars per person per accident for economic loss resulting from injury arising out of the ownership, maintenance or use of a private passenger motor vehicle as a motor vehicle, subject to the provisions of this chapter. (b) Injury does not arise out of the ownership, maintenance or use of a parked vehicle as a private passenger motor vehicle unless (1) the injury was sustained by a person while occupying the vehicle, (2) the vehicle was parked in such a way as to cause unreasonable risk of the injury which occurred or (3) the injury was the direct result of physical contact with (i) equipment permanently mounted on such vehicle, while such equipment was being operated or used, or (ii) property being lifted onto or lowered from such vehicle in the loading or unloading process. (c) Basic reparations benefits are payable to or for the benefit of the injured person, or, in the event of his death, to or for the benefit of his dependent survivors. (d) The maximum amount of basic reparations benefits payable for all economic loss

   resulting from injury to any one person as the result of any one accident shall not exceed five thousand dollars per person regardless of the number of insurers involved. If two or more insurers are liable to pay benefits for such an injury, any insurer paying the benefits due shall be entitled to recover from each of the other insurers an equitable pro rata share of the benefits paid and expenses incurred in processing the claim. (e) Basic reparations benefits for work loss, other than unemployment compensation, shall not exceed eighty-five per cent of the value of such work loss. Basic reparations benefits for work loss and survivor's loss shall not in any event exceed two hundred dollars for loss sustained in any one week, such maximum to apply pro rata to any lesser period.

3. 40 Pa.Stat.Ann. § 1009.202 provides, in part:
   Basic loss benefits
   (a) Allowable expense limits.—Allowable expense, as defined in section 103 of this act shall be provided or the equivalent in the form of a contract to provide for services required.
   (b) Work loss limits.—Work loss, as defined in section 103 shall be provided:
   (1) up to a monthly maximum of:
   (A) one thousand dollars ($1,000) multiplied by a fraction whose numerator is the

True, the limits in the Pennsylvania plan are more complicated of calculation and somewhat higher than the simple, flat limit in the Connecticut system, and, indeed, there is no limit on medical expenses in the Pennsylvania plan, but we do not see any reason to believe that a difference of legislative opinion as to the *amount* of the benefits has any effect on their classification. The Connecticut Act's limits may be lower than those provided in the Pennsylvania Act, but they are still first party benefits.

Secondly, the plaintiff contends that the Connecticut Act lacks genuinely first party benefits because it provides for subrogation.[4] We find this argument totally without merit. Pennsylvania law allows subrogation under circumstances that differ only in detail from those provided for in the Connecticut Act.[5]

average per capita income in this Commonwealth and whose denominator is the average per capita income in the United States, according to the latest available United States Department of Commerce figures; or

(B) the disclosed amount, in the case of a named insured who, prior to the accident resulting in injury, voluntarily discloses his actual monthly earnings to his obligor and agrees in writing with such obligor that such sum shall measure work loss; and

(2) up to a total amount· of fifteen thousand dollars ($15,000).

(c) Replacement service losses.——Replacement services loss, as defined in section 103 shall be provided up to a daily maximum of twenty-five dollars ($25) for an aggregate period of one year.

(d) Survivors losses.——Survivors loss, as defined in section 103 shall be provided in an amount not to exceed five thousand dollars ($5,000).

. . . .

4. Conn.Gen.Stat. § 38–325 provides:

Subrogation. (a) Except as provided in this section, an insurer does not have, and may not directly or indirectly contract for, any right of subrogation to the proceeds of any cause of action of a recipient of basic reparations benefits against any person or organization not entitled to an exemption from liability under section 38–323.

(b) Whenever a person who receives basic reparations benefits for an injury recovers damages, either by judgment or settlement, from the owner, registrant, operator or occupant of a private passenger motor vehicle with respect to which security has been provided under this chapter or from a person or organization legally responsible for his acts or omissions, the insurer is entitled to reimbursement from the claimant to the extent that said basic reparations benefits have been paid, minus an amount which represents the insurer's contribution toward attorney's fees and costs, by a fraction, the numerator of which shall be the amount of basic reparations benefits received by the claimant, less court costs. In no event shall such amount exceed one-third the amount of the basic reparations to be reimbursed to the insurer. The insurer shall have a lien on the claim-

ant's recovery for the amount to which he is entitled for such reimbursement.

(c) Whenever a person who receives basic reparations benefits for an injury has a right of recovery against any person or organization not described in subsection (b), an insurer that has paid such benefits to or for the injured person shall be subrogated to all such rights of recovery to the extent of its payments.

(d) Under subsections (b) and (c), the right to reimbursement and the retention of subrogation recoveries shall in no event exceed the amount actually recovered after the deduction of reasonable and necessary expenditures, including attorney's fees.

5. 40 Pa.Stat.Ann. § 1009.111(a) provides:

Reimbursement and subrogation.——

(1) Except as provided in paragraphs (2) and (3) of this subsection, an obligor:

(A) does not have and may not contract, directly or indirectly, in whole or in part, for a right of reimbursement from or subrogation to the proceeds of a victim's claim for relief or to a victim's cause of action for noneconomic detriment; and

(B) may not directly or indirectly contract for any right of reimbursement based upon a determination of fault from any other obligor not acting as a reinsurer for no-fault benefits which it has paid or is obligated to pay as a result of injury to the victim.

(2) Whenever an individual who receives or is entitled to receive no-fault benefits for an injury has a claim or cause of action against any other person causing the injury as based upon a determination of fault, the obligor is subrogated to the rights of the claimant only for:

(A) elements of damage compensated for by security for the payment of no-fault benefits in excess of the minimum basic loss benefits required under this act are recoverable; and

(B) the obligor has paid or become obligated to pay accrued or future no-fault benefits in excess of the minimum basic loss benefits required under this act.

(3) Nothing in this subsection shall preclude any person supplying or providing products,

In order to accept either of the plaintiff's attacks on the suitability of the Connecticut No-Fault Act, we would have to read § 110(c) of the Pennsylvania Act as requiring that another state's no-fault plan could be used to determine basic loss benefits only if it were virtually identical to the Pennsylvania Act. Were this the Pennsylvania Legislature's intention, it might just as well have simply required application of the Pennsylvania Act's basic loss benefits to all victims of accidents occurring in the state.

We see no reason that this or any other court should apply an attenuated line of interest analysis to reach a choice of law decision contrary to express statutory language by purporting to discover minute ambiguities in comprehensive statutes. Our court-created solutions to conflicts of laws problems are sufficiently difficult of application that we should be grateful when the legislature answers these questions for us.

■ Consequently, we hold that the extent of the plaintiff's recovery of basic loss benefits is governed by the law of Connecticut, see Conn.Gen.Stat. § 38–320. Because it is evident from the pleadings that the defendant, Fireman's Fund, has either paid or offered to pay the plaintiff's expenses up to the Connecticut limit of $5,000, there can be no statutory basis for a further recovery against either the Pennsylvania Assigned Claims Plan or Fireman's Fund.

We recognize that our decision today is contrary to some dicta in *Wierbinski v. State Farm Mut. Auto. Ins. Co.*, 477 F.Supp. 659, 662–664, (W.D.Pa., 1979). Judge Knox, however, wrote that opinion without the benefit of either *Toter v. Knight*, 278 Pa. Super. 547, 420 A.2d 676 (1980), or *DuBose v. McCoy*, 277 Pa.Super. 149, 419 A.2d 705 (1980).

■ The plaintiff raises one final basis for contractual recovery against Fireman's Fund. We are directed to two paragraphs of the insurance policy concerning out of state coverage:

> If an auto accident to which this policy applies occurs in any state or province other than the one in which your covered auto is principally garaged, we will interpret your policy for that accident as follows:
>
> . . . .
>
> 2. If the state or province has a compulsory insurance or similar law requiring a nonresident to maintain insurance whenever the nonresident uses a vehicle in that state or province, your policy will provide the required minimum amount and types of coverage.

Exhibit A to plaintiff's complaint.

It is earnestly argued by the plaintiff that this provision is ambiguous.[6] We must

services, or accommodations from contracting or otherwise providing for a right of reimbursement to any basic restoration benefits for allowable expense.

(4) In no event shall any entity providing benefits other than no-fault benefits to an individual as described in section 203 of this act, have any right of subrogation with respect to said benefits.

6. Plaintiff's Brief at 7–8 states:

This provision is susceptible of several interpretations. First the policy can be construed as providing coverage for an insured who "uses" a vehicle by virtue of being a passenger in a vehicle in another state which requires coverage different from that provided under Connecticut law. The term "use" is not defined in the policy. Under the Pennsylvania No-Fault Act, however, the term use encompasses the mere occupation of a motor vehicle. Furthermore, the provision does not restrict term vehicle to a "covered auto." Thus, the provision can be interpreted as stating that

coverage will be increased where an insured occupies any motor vehicle out of the state of Connecticut.

Secondly, the driver of the vehicle, Stephen E. Emerson, was a New Jersey resident at the time of the accident. He was, therefore, required by the Pennsylvania No-Fault Act to maintain insurance while operating his vehicle within the Commonwealth of Pennsylvania. The term "non-resident" as used in the out-of-state coverage clause of the policy issued to the plaintiff's father does not define the term "nonresident". Accordingly, the term could be used to refer to either the plaintiff or Mr. Emerson. Thus, it can be contended that as Mr. Emerson was required to maintain no-fault coverage due to the operation of the Pennsylvania No-Fault Act, the policy issued to the plaintiff's father would provide expanded coverage commensurate with that required under the Pennsylvania No-Fault Act.

The final interpretation, is that the clause states that expanded coverage will be provided

again disagree. We cannot see that this provision is anything more than a pledge that the policy would provide the insurance coverage legally required of the insured by the state in which the accident occurred. We are directed to no Pennsylvania law requiring that passengers obtain any automobile insurance at all.

Even if the out-of-state endorsement in this policy were so ambiguous as to permit an interpretation along the lines suggested by the plaintiff, a glance at the policy as a whole reveals that this isolated provision is in the *liability insurance* section of the policy. The first page of the policy clearly indicates a $5,000 limit as to basic reparations benefits. This limit is reiterated in the Connecticut endorsement which, according to the affidavit of Gerry Gorman of Fireman's Fund, was attached to the insurance policy of the plaintiff's father. Consequently, there can be no contractual basis for additional recovery of basic reparations benefits beyond those authorized by Connecticut law.

As we have considered Mr. Gorman's affidavit, we shall treat our disposition of the plaintiff's claim against Fireman's Fund as one of summary judgment. Fed.R.Civ.P. 12(c), 56.

Appropriate orders will issue.

when an insured operates a vehicle in a state requiring no-fault coverage. There are, then, three interpretations possible here. According-

ly, the policy is ambiguous and must be construed in favor of the insured.